

## NUMBER 13-08-00664-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

YOLANDA MARTINEZ,                                                  Appellant,

v.

JUAN CASTANEDA AND JESUSA
CASTANEDA A/K/A JESUSITA
CASTANEDA,                                                        Appellees.

### On appeal from the 404th District Court
### of Cameron County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza**
**Memorandum Opinion by Chief Justice Valdez**

This appeal involves a dispute regarding the alleged sale of real property situated

in La Feria, Cameron County, Texas. After a bench trial, the trial court entered a judgment

in favor of appellees, Juan and Jesusa Castaneda a/k/a Jesusita Castaneda, stating that:

(1) a contract existed between the parties for the purchase of the real property; (2) the Castanedas had fully performed under the contract; and (3) the Castanedas owned the property in question and were entitled to specific performance under the contract. By three issues, appellant, Yolanda Martinez, argues that: (1) as a matter of law, no enforceable contract existed between the parties because the purported contract neither satisfied the requirements of the Statute of Frauds nor the elements of a contract; (2) the trial court erred in concluding that she had ratified the purported contract; and (3) the trial court erred in concluding that she had waived her right to contest the existence of the purported contract. We reverse and remand.

## I. BACKGROUND

Martinez, a migrant worker who spends much of her time laboring in Michigan, and her ex-husband, Guadalupe S. Medina, acquired a 2.45-acre tract of land in La Feria, Texas, on December 19, 1991. Martinez and Medina paid $23,639.70 for the lot, which was financed through Harlingen National Bank. Martinez and Medina built a three-bedroom, two-and-a-half bathroom house on the lot for approximately $52,000. Martinez, Medina, and the couple's children resided in the house until Martinez and Medina filed for divorce in Michigan in 1999.

On April 19, 1999, a Michigan circuit court entered a final divorce decree, which awarded Martinez the 2.45-acre tract of land and the house in exchange for a lump-sum payment of $15,000 to Medina. At the time, Martinez did not have $15,000 to pay Medina, so she took out a home equity loan for $36,000 from Long Beach Mortgage Company ("Long Beach").[1] To secure the home equity loan, Martinez was required to obtain an

---

[1] In the promissory note executed by Long Beach Mortgage Company, the address of the land at issue was noted as follows: "1 ½ Mile North Kansas Road[;] La Feria, Texas 78557."

appraisal of the property. The appraiser determined that the "fair market value" for the property was $89,000. Long Beach approved the loan and provided Martinez with $36,000 in funds. Martinez allegedly used the funds to pay Medina $15,000 with the remainder used to re-finance the remaining balance of the existing mortgage on the property with Washington Mutual Bank.

Because Martinez frequently lived and worked in Michigan, the property was often left vacant. Martinez leased an apartment in Michigan for times when she was required to work in Michigan. While in Michigan, Martinez met the Castanedas. Juan Castaneda was a childhood friend of Martinez's ex-husband dating from the time when the two resided in South Texas many years ago.[2] Martinez and the Castanedas became close friends, and Martinez often confided in the Castanedas during her divorce from Medina.

In late 2000, Martinez began having trouble paying the mortgage and taxes on the property in La Feria while also paying rent on her Michigan apartment. Shortly thereafter, Martinez discussed her situation with the Castanedas and offered to let the Castanedas live in her La Feria home and make the mortgage and tax payments with the possibility of buying the home at a later date. The Castanedas had recently moved to South Texas and, at the time, were renting a nearby apartment. The Castanedas agreed to live in Martinez's house, and on or about December 1, 2000, Martinez executed a notarized "Affidavit of Fact," which provided as follows:

To whom it may concern:

I, Yolanda Martinez[,] want to verify that Juan and Jesusa Ca[s]taneda are living in my home located at North Kansas City Rd. in La Feria, Texas.

---

[2] At trial, Martinez testified that Jesusa Castaneda is Medina's cousin; however, Juan Castaneda countered that allegation by testifying that neither he nor his wife are related to Medina and that he and Medina are childhood friends who happened to call each other "primos."

3

Utility bills are being paid by them and they will be responsible for the mortgage payment of $375.00 per month. This contract is also including an option to buy by the Castaneda[s].

No other contractual terms were included in the affidavit at this time.

The Castanedas subsequently moved into the house in August 2001, and began making mortgage payments on the property to Washington Mutual. Jesusa testified that, while her family lived at the house, they arranged to pay off $6,000 in tax liens associated with the property.[3]

Later, the Castanedas and Martinez continued to discuss the need for a written contract pertaining to the property, including a specific sales price that corresponded to the option to buy. The Castanedas drafted a proposed sales contract and sent it to Martinez. The proposed contract contained the following language, in pertinent part:

> THIS AGREEMENT made between YOLANDA ISABEL MARTINEZ (former Medina) (First Party) and JUAN AND JESUSA CASTANEDA (Second Party).
>
> Immediate Take Over payments of the property located in CAMERON County, Texas:
>
> 1 ½ MILES NORTH KANSAS CITY ROAD, LA FERIA, TX
>
> LOT NUMBER ONE (1), Q SUBDIVISION IN CAMERON COUNTY, TEXAS ACCORDING TO MAP OF SAID SUBDIVISION, RECORDED IN CABINET 1, PAGE 522-B, MAP RECORDS, CAMERON COUNTY, TX
>
> Second party agrees to take over payments and taxes due of said property and give prompt payments due on the 1st of each month of $395.79 (mortgage insurance included). Payable to LONG BEACH MORTGAGE COMPANY, P[.]O[.] BOX 61489 ORANGE, CA 92868, ACCOUNT # . . . which will no longer be paid by first party and paid by second party immediately. The second party agrees to take immediate custody of the said property until proper sale and documents are obtained transferring ownership and agrees to pay to First Party $1,000.00 monthly for a year beginning April 2001 (which First Party has received $1,500 paid by Second

---

[3] Martinez disputed this characterization of the transactions and noted that she was never aware that any tax liens were assessed against the property.

4

Party towards the sale of said property).

However, neither Martinez nor the Castanedas signed the proposed contract.

At some later point, Jesusa revised Martinez's "Affidavit of Fact" by adding the following language: "We have also [been] giving Mrs. Martinez a down payment of $1,500.00 on this contract and we are also paying the taxes on this contract too. [I]f you have any question[s], please call . . . Susie Castaneda."[4] Jesusa then filed and recorded the revised "Affidavit of Fact" in the Cameron County public records on December 6, 2001. The record does not reflect that Martinez agreed to the revisions made to the "Affidavit of Fact."

During 2001, the Castanedas made several payments directly to Martinez; however, the purpose of these payments is not entirely clear from the record before us. What is clear from the record is that the parties did not agree on a price for the purchase of the property. Juan testified that he recalled a conversation with Martinez, whereby Martinez agreed to sell the property to the Castanedas for the remaining balance on the mortgage, $36,000, plus an additional $8,000 to $10,000. In contrast, both Martinez and Jesusa acknowledged that the parties did not agree on a price for the sale of the property. The documentary evidence contained in the record does not support Juan's testimony regarding the sales price.

Shortly after moving into the house, the Castanedas stopped making the mortgage payments on the property. Washington Mutual notified Martinez that she was in default on her loan obligations and that, if she did not bring her payments up to date, it would foreclose on the property. Martinez testified that she immediately called Jesusa and

---

[4] The record established that Jesusa's nickname is Susie.

5

inquired about the missed mortgage payments. Jesusa told Martinez that she stopped paying the mortgage because "she had to take care of her own personal debt first."

As a result of the missed mortgage payments, Martinez informed the Castanedas that if they could no longer make the mortgage payments, then they would need to move out of the house. The Castanedas refused to move out of the house, and Martinez brought the mortgage payments up to date and continued to make the mortgage payments on the property until the date of trial.

On November 27, 2001, counsel for the Castanedas sent Martinez a letter requesting information regarding the purchase price and terms of payment for the property. In this letter, counsel represented that the Castanedas were still making the mortgage payments on the property.[5] By letter dated August 6, 2002, Martinez responded to counsel's November 27, 2001 letter, asserting that: (1) she was willing to finalize the sale of the property to the Castanedas for $100,000; (2) any remodeling or improvements done to the property would not be deducted from the sales price; and (3) a failure to agree to these terms would result in eviction within thirty days of the date of the letter.

At trial, Jesusa denied ever receiving Martinez's August 6, 2002 letter. On August 22, 2002, Martinez sent a second letter, this time directly to the Castanedas, informing them of her terms for the sale and notifying them that they had thirty days to agree to the terms or risk eviction. At this time, appellant obtained legal counsel, who proceeded to negotiate with counsel for the Castanedas for the purchase of the property.

On February 3, 2003, in an attempt to pay off the remaining balance of the mortgage on the property, the Castanedas tendered a check for $19,200 to the mortgage

---

[5] Martinez alleges in her appellate brief that the subsequent mortgage payments were "without appellant's knowledge or consent."

6

department of Washington Mutual. Martinez testified that she was not aware of and did not authorize the Castanedas to pay off the remaining balance of the mortgage. After learning that the Castanedas had tried to pay off the remaining balance of the mortgage, Martinez instructed Washington Mutual to "reverse" the payment and issue a refund check to the Castanedas. The Castanedas deny ever receiving the refund check, and the record does not reflect that the check was ever cashed.

By August 2003, the Castanedas had still not vacated the premises, and the parties had not agreed to terms on the sale of the property. Thus, Martinez hired counsel to pursue the matter further. Martinez filed an original petition for declaratory judgment on November 15, 2004, wherein she requested that the trial court: (1) declare that she is the owner of the property; (2) declare that the Castanedas have no right to possession or use of the property; and (3) order the Castanedas to vacate the property immediately. In addition, Martinez requested reasonable attorney's fees under section 37.009 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 2008) ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.").

Once Martinez filed her declaratory judgment action, the Castanedas began making significant improvements to the property, including converting the garage into an apartment for the Castanedas' daughter, reworking the plumbing to the house, and repairing the kitchen and bathrooms and the several interior walls that had holes.[6]

On March 24, 2005, the Castanedas filed an original answer generally denying all of the allegations contained in Martinez's original petition, asserting the affirmative

---

[6] Juan testified that they did not secure permits from the city for the improvements made to the house.

7

defenses of accord and satisfaction and payment, and requesting reasonable attorney's fees pursuant to section 37.009 of the civil practice and remedies code. *See id.* At trial, the parties stipulated to reasonable attorney's fees for work done up to the date of trial and for subsequent work on appeal.

After conducting a bench trial on the matter, the trial court, on August 19, 2008, concluded that the Castanedas owned the property in question and ordered that Martinez take nothing on her declaratory judgment action and execute a warranty deed to the Castanedas for the property within thirty days of the order. The trial court also awarded the Castanedas their stipulated attorney's fees in the amount of: (1) $10,000 for work done in the trial court; (2) $7,500 for an appeal to this Court; and (3) $5,000 for an appeal to the Texas Supreme Court.

Martinez subsequently filed a timely request for findings of fact and conclusions of law and a motion for new trial. The motion for new trial was denied, but the trial court issued findings of fact and conclusions of law on September 29, 2008. Among the trial court's findings of fact and conclusions of law were the following: (1) Martinez and the Castanedas entered into a valid, enforceable contract for the purchase of the property; and (2) the Castanedas gave consideration for the contract by paying off Martinez's mortgage. The trial court further found that the terms of the sale were as follows: (1) "Defendants [the Castanedas] to take immediate possession of Plaintiff's [Martinez] real estate"; (2) "Defendant to take over Plaintiff's mortgage payments"; (3) "Defendants to pay real estate taxes on Plaintiff's property"; and (4) "Defendants to pay Plaintiff the sum of $12,000." As a result of these terms, the trial court also found that: (1) "defendants took immediate possession of the property in question; took over the [P]laintiff's mortgage payments; paid

8

the real estate taxes and paid Plaintiff $12,372.90, i.e., $6,700 direct payments to Plaintiff and $5,672.90 as a result of defendants' mortgage payoff"; (2) Martinez ratified the contract by her conduct; and (3) Martinez waived her right to contest the existence of the contract based upon her actions. This appeal ensued.

## II. STANDARD OF REVIEW

A trial court's findings of fact in a bench trial "have the same force and dignity as the jury's verdict upon questions." *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see Ashcraft v. Lookadoo*, 952 S.W.2d 907, 910 (Tex. App.–Dallas 1997, writ denied) (en banc). Further, "[w]hen the trial court acts as a fact[-]finder, its findings are reviewed under legal and factual sufficiency standards." *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000).

In reviewing for legal sufficiency of the evidence, we consider the evidence in the light most favorable to the trial court's finding. *See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008). The test for legal sufficiency "must always be whether the evidence at trial would enable [a] reasonable and fair-minded [fact-finder] to reach the [conclusion] under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We must credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* The fact-finder is the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *Id.* at 819.

We review the trial court's conclusions of law de novo. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Corpus Christi Housing Auth. v. Lara*, 267 S.W.3d 222, 226 (Tex. App.–Corpus Christi 2008, no pet.). Conclusions of law are upheld if the judgment can be sustained on any legal theory the evidence supports.

9

*Villagomez v. Rockwood Specialities, Inc.*, 210 S.W.3d 720, 748 (Tex. App.–Corpus Christi 2006, pet. denied). Thus, incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id.*

In reviewing factual sufficiency, we consider and weigh all of the evidence and will "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Fact findings are not conclusive when, as in this case, a complete reporter's record appears in the record if the contrary is established as a matter of law or if there is no evidence to support the finding. *Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 257 (Tex. App.–Houston [14th Dist.] 2003, pet. denied).

### III. WAIVER AND RATIFICATION OF THE PURPORTED CONTRACT

By her second and third issues, Martinez argues that the trial court erred in finding that, based on her actions, she waived her right to contest the existence of the purported underlying contract and that she ratified the contract. Specifically, Martinez asserts that waiver and ratification are affirmative defenses that the Castanedas were required to plead and prove, yet they did not. Moreover, Martinez contends that the record does not clearly demonstrate that she intended to waive her right to challenge the existence of the contract or that she ratified the contract. In their appellate brief, the Castanedas have not provided any argument to refute Martinez's contentions regarding these issues.

Waiver and ratification are affirmative defenses. *See* TEX. R. CIV. P. 94; *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); *Swank v. Cunningham*, 258 S.W.3d 647, 650 n.7 (Tex. App.–Eastland 2008, pet. denied); *see also Swonke v. First Colony Cmty. Servs. Assoc., Inc.*, No. 14-09-0019-CV, 2010 Tex. App. LEXIS 4451, at *14

10

n.2 (Tex. App.–Houston [14th Dist.] June 15, 2010, no pet. h.) (mem. op.); *Duncan v. Hershey*, No. 13-06-00370-CV, 2009 Tex. App. LEXIS 2814, at *7 (Tex. App.–Corpus Christi Apr. 23, 2009, no pet.) (mem. op.). Waiver "can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right." *Tenneco Inc.*, 925 S.W.2d at 643 (citing *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)). Ratification occurs if a party recognizes the validity of a contract by acting or performing under the contract or by otherwise affirmatively acknowledging it, or, in other words "if a party by its conduct recognizes a contract as valid, having knowledge of all relevant facts, it ratifies the contract." *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 146 (Tex. App.–Corpus Christi 2006, pet. denied); *see Mo. Pac. R.R. Co. v. Lely Dev. Corp.*, 86 S.W.3d 787, 792 (Tex. App.–Austin 2002, pet. dism'd). Waiver and ratification, however, like all affirmative defenses, require that a party plead, prove, and secure findings regarding the defense. *See* Tex. R. Civ. P. 94; *In re B.L.M.*, 114 S.W.3d 641, 649 (Tex. App.–Fort Worth 2003, no pet.) (citing *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988)); *see also In re J.I.*, No. 2-04-299-CV, 2005 Tex. App. LEXIS 3462, at **43-44 (Tex. App.–Fort Worth May 5, 2005, no pet.) (mem. op.) ("A defendant relying on an affirmative defense must plead, prove, and secure findings sustaining the defense.").

In the instant case, the Castanedas did not plead the affirmative defenses of waiver or ratification. Instead, in their original answer, the Castanedas pleaded the affirmative defenses of accord and satisfaction and payment. *See* Tex. R. Civ. P. 94. Moreover, the record reflects that the parties repeatedly communicated with one another to try to agree to terms on the sale of the property; however, no such agreement appears to have been

11

made. We cannot say, based on the record before us, that Martinez's actions indicate that she intentionally relinquished her right to challenge the purported contract or that her conduct was inconsistent with claiming that right. *See Tenneco Inc.*, 925 S.W.2d at 643; *see also Benton*, 728 S.W.2d at 37. Furthermore, we note that "ratification is an affirmative defense, not a theory of recovery"; in other words, the trial court's finding in favor of the Castanedas cannot be premised on ratification when the Castanedas failed to plead and prove the affirmative defense. *See Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 304-05 (Tex. App.–Dallas 2009, no pet.) (citing *Land Title Co. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980)).

Because the Castanedas failed to plead the affirmative defenses of waiver and ratification, we conclude that the trial court's waiver and ratification findings are erroneous. *See BMC Software Belg., N.V.*, 83 S.W.3d at 794; *Lara*, 267 S.W.3d at 226; *see also Ventura*, 102 S.W.3d at 257. Accordingly, we sustain Martinez's second and third issues and proceed to analyze Martinez's appellate arguments pertaining to the existence of the purported contract.

## IV. STATUTE OF FRAUDS

By her first issue, Martinez contends that, as a matter of law, no enforceable contract existed between her and the Castanedas. In particular, Martinez argues that the contract lacked essential terms, such as an adequate description of the property, the sales price, and the terms of payment, which, in turn, fail to satisfy the statute of frauds. In addition, Martinez asserts that the missing contractual information means that the contract does not meet the requirements for enforceability. The Castanedas counter by arguing that the evidence supports the trial court's findings of fact and conclusions of law that a

12

valid, enforceable contract existed between the parties. They also assert that the "Affidavit of Fact" or "memorandum" satisfied the statute of frauds because the statute of frauds does not require the purchase price or terms of payment be included in the writing. Alternatively, the Castanedas contend that the contract is not subject to the statute of frauds because of the "partial performance" exception.

## A.    The Statute of Frauds

A contract for the sale of land must comply with the statute of frauds. TEX. BUS. & COM. CODE ANN. § 26.01(b)(4) (Vernon 2009); *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978); *Garrod Invs., Inc. v. Schlegel*, 139 S.W.3d 759, 763 (Tex. App.–Corpus Christi 2004, no pet.). Section 26.01(a) of the business and commerce code requires that the contract be in writing and signed by the party against whom enforcement is sought. TEX. BUS. & COM. CODE ANN. § 26.01(a); *Garrod Invs., Inc.*, 139 S.W.3d at 763. Further, the statute of frauds is an affirmative defense. *Garrod Invs., Inc.*, 139 S.W.3d at 763. Whether a contract meets the requirements of the statute of frauds is a question of law. *Bratcher v. Dozier*, 162 Tex. 319, 346 S.W.2d 795, 796 (1961); *Lathem v. Kruse*, 290 S.W.3d 922, 926 (Tex. App.–Dallas 2009, no pet.).

To satisfy the statute of frauds, there must be a written memorandum which "must be complete within itself in every material detail and must contain all the essential elements of the agreement, so that the contract can be ascertained from the writing without resorting to oral testimony." *Garrod Invs., Inc.*, 139 S.W.3d at 763 (citing *Cohen*, 565 S.W.2d at 232); *see Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 594 (Tex. App.–Houston [14th Dist.] 2000, no pet.); *Bachman Ctr. Corp. v. Sale*, 359 S.W.2d 290, 294 (Tex. Civ. App.–Dallas 1962, writ ref'd n.r.e.) (stating that "the essential elements of a contract required to be in

writing may never be supplied by parol [evidence]").

## B. The Elements of a Contract

In order for a contract to be enforceable, there must be an offer, an acceptance in strict compliance with the terms of the offer, a meeting of the minds, each party's consent to the terms, and execution and delivery of the contract with the intent that it be mutual and binding. *See ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 291 (Tex. App.–Corpus Christi 2003, pet. denied); *see also Johnson v. Aransas County Navigation Dist. No. 1*, No. 13-06-601-CV, 2008 Tex. App. LEXIS 7324, at *8 (Tex. App.–Corpus Christi Oct. 2, 2008, pet. denied) (mem. op.). All of these elements must be met in order for the contract to be enforceable. *See Brownsville Barge & Crane, Inc.*, 115 S.W.3d at 291. Contracts usually require mutual assent and the signatures of all the parties to be enforceable. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007).

To be enforceable for the sale of land, the essential elements of the contract must be expressed in a manner that makes them understandable without looking to parol evidence. *Condovest Corp. v. John Street Builders, Inc.*, 662 S.W.2d 138, 140 (Tex. App.–Austin 1983, no writ). Further, when the remedy is specific performance, as was the case here, greater certainty respecting the terms and conditions of a contract sought to be enforced is required in equity than at law. *Burr v. Greenland*, 356 S.W.2d 370, 373 (Tex. Civ. App.–El Paso 1962, writ ref'd n.r.e.).

## C. Discussion

As noted above, the "Affidavit of Fact" executed by Martinez provided the following:

> I, Yolanda Martinez[,] want to verify that Juan and Jesusa Ca[s]taneda

14

are living in my home located at North Kansas City Rd. in La Feria, Texas.

> Utility bills are being paid by them and they will be responsible for the mortgage payment of $375.00 per month.  This contract is also including an option to buy by the Castaneda[s].

No other contractual terms were included in the affidavit.  With respect to the statute of frauds, the purported agreement is in writing and is signed by Martinez, "the person to be charged with the promise or agreement."  *See* TEX. BUS. & COM. CODE ANN. § 26.01(a).  However, to satisfy the statute of frauds, the writing must contain all the essential elements of the agreement.  *See Garrod Invs., Inc.*, 139 S.W.3d at 763; *see also Sale*, 359 S.W.2d at 294.

In documents promulgated by both Washington Mutual and Long Beach, the property in question was identified as "1 ½ Miles North Kansas Road" in La Feria, Texas 78557, and noted that the Cameron County records described the property as "LOT NUMBER ONE (1), Q SUBDIVISION, A SUBDIVISION IN CAMERON COUNTY, TEXAS, ACCORDING TO MAP OF SAID SUBDIVISION, RECORDED IN CABINET 1, PAGE 522-B, MAP RECORD, CAMERON COUNTY, TEXAS."  Martinez's "Affidavit of Fact," which the Castanedas contend is the contract to be considered, does not contain the same property description as included in the documents created by Washington Mutual and Long Beach.

With respect to the property description, the Castanedas argue that, when a grantor owns only a single tract, the land need only be identified with reasonable certainty.  *See Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983).  However, the *Pick* Court stated that the essential elements of an agreement may never be supplied by parol evidence and that the terms of the contract must be expressed with certainty and clarity.  *Id.*  And, with respect

15

to the Castanedas' contention regarding the property description at hand, the *Pick* Court noted that "a description in writing which states 'my property,' 'my land,' or owned by me is a sufficient description when it is shown by extrinsic evidence that the party to be charged owns a tract and only one tract of land which satisfies the description." *Id.* Here, the property description does not include a specific address, and, as the record indicates, the property includes both acreage and a house, not just the house. To say that the property description in the "Affidavit of Fact" identifies the property with reasonable certainty would be, in effect, to abrogate the rule requiring contracts or the conveyance of land to be in writing, especially considering the remaining acreage pertaining to the property was never referenced in the "Affidavit of Sale."

In addition, a plain reading of the "Affidavit of Fact" indicates that Martinez provided the Castanedas with an "option to buy" the property. Thus, the "Affidavit of Fact" did not constitute an actual contract to buy the property; it merely constituted an option to buy the property at a later, unspecified date. The Castanedas cite numerous documents in the record to support their argument that they had a binding contract with Martinez; however, none of documents reflect that the parties agreed to a number of essential terms, including the purchase price and means and duration of payment. The affidavit's failure to identify the sales price, an essential term of the contract, with reasonable certainty demonstrates that there was not a "meeting of the minds" between the parties. *See Brownsville Barge & Crane, Inc.*, 115 S.W.3d at 291; *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.–San Antonio 1999, pet. denied) (noting that the determination of whether there was a "meeting of the minds" of the parties is based on the objective standard of what the parties actually said and did, rather than on their subjective state of mind); *see also Argus*

16

*Sec. Sys. v. Owen*, No. 13-02-00219-CV, 2005 Tex. App. LEXIS 2451, at *13 (Tex. App.–Corpus Christi Mar. 31, 2005, no pet.) (mem. op.) (same).

Furthermore, the "Affidavit of Fact" does not speak to the terms of payment for the property. *See Brownsville Barge & Crane, Inc.*, 115 S.W.3d at 291; *see also Johnson*, 2008 Tex. App. LEXIS 7324, at *8. The affidavit does state that the Castanedas were responsible for making the monthly mortgage payments on the house during their occupation of the house. In addition, shortly after moving in, the Castanedas intentionally discontinued paying the mortgage payments, which almost resulted in the foreclosure of the property. Thus, if a contract had indeed existed, the Castanedas would have been in breach of its payment terms. In any event, the affidavit does not speak to the duration of the payments, and it certainly does not state that the monthly payment of the mortgage would result in the Castaneda's ownership of the house. Finally, the Castanedas' attempt to tender $19,200 to Washington Mutual to pay off the remaining balance of the mortgage was unsuccessful, as the check was "reversed" and a refund check was issued.[7]

Based on the foregoing, we cannot say that a valid, enforceable contract for the sale of Martinez's property existed because several essential terms were missing from the purported contract. *See Garrod Invs., Inc.*, 139 S.W.3d at 763; *Brownsville Barge & Crane, Inc.*, 115 S.W.3d at 291; *see also Condovest Corp.*, 662 S.W.2d at 140; *Sale*, 359 S.W.2d at 294. Because several essential terms were missing from the purported contract, and because the record indicates that the parties never agreed to a final sales contract involving the property, we conclude that the purported contract does not satisfy the Statute

---

[7] As noted earlier, the record does not reflect that the Castanedas' $19,200 check to Washington Mutual was ever cashed by Washington Mutual, nor does the record reflect that the Castanedas cashed the refund check that Washington Mutual supposedly issued to them.

17

of Frauds for the sale of real property.  *See Bratcher*, 346 S.W.2d at 796; *see also Lathem*, 290 S.W.3d at 926; *Garrod Invs., Inc.*, 139 S.W.3d at 763.

Despite our conclusion, the Castanedas assert that this transaction is subject to the "partial performance" exception to the Statute of Frauds.  The Castanedas argue that their oral conversations with Martinez give rise to an enforceable contract for the sale of the property.  We disagree.

Under the partial performance exception to the statute of frauds, an oral contract for the purchase of real property is enforceable if the purchaser:  (1) "pays the consideration"; (2) "takes possession of the property"; and (3) "makes permanent and valuable improvements on the property with the consent of the seller, or without such improvements, other facts are shown that would make the transaction a fraud on the purchaser if the oral contract was not enforced."  *Boyert v. Tauber*, 834 S.W.2d 60, 63 (Tex. 1992) (citing *Hooks v. Bridgewater*, 111 Tex. 122, 229 S.W. 1114, 1116 (1921)); *see Pickett v. Keene*, 47 S.W.3d 67, 76 (Tex. App.–Corpus Christi 2001, pet. dism'd); *see also Chavez v. Bravo*, No. 13-07-00708-CV, 2010 Tex. App. LEXIS 669, at **6-7 (Tex. App.–Corpus Christi Jan. 28, 2010, no pet.) (mem. op.).   "These steps are seen as sufficient evidence of the agreement because they provide affirmative corroboration of the agreement by both parties to the agreement."  *Boyert*, 834 S.W.2d at 63.

In the instant case, the Castanedas have failed to prove several elements of the "partial performance" exception to the statute of frauds.  *See Boyert*, 834 S.W.2d at 63; *Pickett*, 47 S.W.3d at 76; *see also Chavez*, 2010 Tex. App. LEXIS 669, at **6-7.   In particular, Juan admitted at trial that significant improvements were made to the property after Martinez had requested that they vacate the premises and after the lawsuit had been

filed. Thus, it cannot be said that the significant improvements made to the property were made with the consent of the seller. *See Boyert*, 834 S.W.2d at 63. Moreover, the Castanedas do not point to any facts in the record demonstrating that a fraud would be worked on the purchaser if the purported oral contract was not enforced. *See id.* We also note that the record demonstrates that the Castanedas, under the purported contract, were required to make monthly mortgage payments as consideration for the option to purchase the property. However, as noted earlier, Jesusa testified that they discontinued making the mortgage payments shortly after moving into the house because she had other bills to pay, which seems to undermine the Castanedas' argument that adequate consideration was paid. *See id.* Based on this evidence, we conclude that the "partial performance" exception to the statute of frauds is inapposite.

Because we have concluded that the purported contract does not satisfy the Statute of Frauds and that the "partial performance" exception does not apply, we hold that the trial court erred in concluding that the Castanedas owned the property. *See BMC Software Belg., N.V.*, 83 S.W.3d at 794; *see also Lara*, 267 S.W.3d at 226; *Ventura*, 102 S.W.3d at 257. Accordingly, we sustain Martinez's first issue.

## V. Conclusion

Based on the foregoing, we reverse the judgment of the trial court and remand for proceedings consistent with this opinion.

ROGELIO VALDEZ
Chief Justice

Delivered and filed the
22nd day of July, 2010.